[This opinion has been published in *Ohio Official Reports* at 72 Ohio St.3d 491.]

THE STATE OF OHIO, APPELLEE, *v.* KINLEY, APPELLANT.

[Cite as *State v. Kinley*, 1995-Ohio-279.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 93-1708—Submitted April 19, 1995—Decided July 19, 1995.)

APPEAL from the Court of Appeals for Clark County, No. 2826.

_____

{¶ 1} In August 1988, Juan Antonio Lamar Kinley, appellant, began dating Thelma Miller. Throughout the course of their relationship, appellant physically beat Thelma and regularly threatened to kill her. In August 1988, appellant beat Thelma for attending a movie with another man. In October 1988, appellant assaulted Thelma and threatened to kill her. In mid-December 1988, appellant physically beat Thelma at a restaurant where appellant and Thelma were employed. At that time, appellant told Thelma, "That's it, you've had it." Later that month, in December 1988, appellant threatened to kill Thelma if he ever caught her with another man.

{¶ 2} Thelma began dating Ronald Hildenbrand in December 1988 or January 1989. On January 8, 1989, Hildenbrand and Thelma were at Thelma's apartment. Appellant barged into the apartment, shoved Thelma, and threatened that he was going to "get" Thelma and her two sons, David and Daniel Miller. During the altercation, Daniel Miller called "911" to report the incident to police. The telephone call was recorded, and appellant could be heard in the background shouting that Thelma was a "bitch" and a "fucking whore." Appellant could also be heard saying, "I'm going to fuck you up, Misty [Thelma] * * *."

{¶ 3} The following day, on January 9, 1989, appellant mentioned to a friend that he (appellant) felt like killing Thelma because Thelma had been seeing another man. Another witness heard appellant say, "Well, if I can't have her

[Thelma], no one will."  On January 9, Thelma called Project Woman, a crisis-intervention agency for battered women.  Thelma made an appointment with the agency for January 10, at 2:00 p.m.

{¶ 4} Elaine Szulewski and her husband, Richard Szulewski, lived at 6780 North River Road in Clark County, Ohio.  Thelma occasionally worked for the Szulewskis as a housekeeper.  On the morning of January 10, 1989, Thelma arrived at the Szulewski residence to begin her scheduled cleaning duties.  Elaine Szulewski telephoned Thelma at the residence and spoke with her at approximately 10:00 a.m.  Szulewski again called Thelma at approximately 1:00 p.m., but no one answered the phone at the Szulewski residence.

{¶ 5} On January 10, 1989, at approximately 5:00 p.m., Elaine Szulewski returned home from work and found Thelma's body and the body of Thelma's youngest child, David, lying in a pool of blood in the Szulewskis' garage.  The victims had been brutally hacked to death.  Each victim had suffered multiple lacerations and cut wounds to their heads and bodies.  The victims' wounds had been inflicted with great force and intensity.  A number of the blows had penetrated deeply into (or completely through) the victims' bones.  Several of Thelma's appendages had been severed from her body.  The nature of David's wounds indicated that he had probably survived for a period of time following the attack.

{¶ 6} Police quickly responded to the scene.  Bloody shoe prints were found in the garage, but no blood was found in the Szulewski residence.  Thelma's car was parked in the driveway, but her car keys were nowhere to be found.  Thelma's purse was missing from the Szulewskis' home, along with $121 she had been carrying in a flowered bank envelope a day or two before the murders.  Approximately $300 in cash was missing from a dresser in the Szulewski bedroom.  Also missing was $25 that Elaine Szulewski had placed underneath a tissue box for payment of Thelma's cleaning services.  Additionally, Richard Szulewski's machete was missing from the garage.

{¶ 7} Victor Bishop was with appellant on the morning of January 10, 1989. Appellant arrived at Bishop's house at approximately 9:45 a.m. However, appellant left Bishop's house at approximately 10:45 a.m. Appellant then returned approximately one hour later with a large a sum of money in a flowered bank envelope. Upon appellant's return, Bishop noticed that appellant had a set of car keys that appellant had not been carrying earlier that day.

{¶ 8} On the evening of January 10, 1989, police spoke with appellant and informed him that Thelma had been murdered. According to police, appellant became very excited and said, "Well, is David dead? Is David dead too?" Appellant informed police that Thelma and David had visited appellant's home that morning, at approximately 9:30 a.m. Appellant claimed that Thelma had dropped off $40 to enable appellant to pay a $31 court fine. Appellant denied having ever been to the Szulewski residence.

{¶ 9} On January 10, 1989, at approximately noon, Randy Maggard was driving on Selma Road near the vicinity of the murder scene. After passing the intersection of Selma and North River Road, Maggard noticed a white and gold 1981 Plymouth automobile being driven erratically and at a high rate of speed. The driver of the Plymouth, an African-American male, tailgated Maggard's vehicle for some distance. Another witness also saw the 1981 Plymouth in the vicinity of the murder scene at approximately noon on January 10. Both witnesses later identified appellant's mother's automobile as the vehicle they had seen in the vicinity of the murders.

{¶ 10} On January 12, 1989, appellant was once again questioned by police. Appellant was confronted with the fact that witnesses had seen him near the scene of the killings. During questioning, appellant admitted that he had been to the Szulewski residence the day of the murders. Appellant gave differing accounts of his visit to the residence, but steadfastly denied killing Thelma and David Miller. Appellant repeatedly lied during his interviews with police.

{¶ 11} The bloody shoe prints found at the murder scene were made by size ten shoes similar to the type of shoes appellant had been wearing prior to the killings. Bloodstains were detected on appellant's jacket. The bloodstained jacket had been seized by police without a warrant. DNA analysis revealed that it was highly probable the blood had come from David Miller. A forensic expert found blood in several areas of appellant's mother's 1981 Plymouth automobile -- the automobile that appellant had been driving on the day of the murders. Human blood was found on the steering wheel. A floormat was missing from the driver's side of the vehicle. On January 12, 1989, police executed a search warrant at appellant's residence and found $291.50 in cash and approximately $30 to $50 worth of marijuana.

{¶ 12} In the latter part of January 1989, appellant admitted to his friend, Donald A. Merriman, that he had killed Thelma and David Miller. Appellant told Merriman that he (appellant) had "fucked them up."

{¶ 13} In April 1989, police recovered a machete similar to the one that had been missing from the Szulewskis' garage. The bloodstained machete was found in an alley behind appellant's house. Richard Szulewski identified the machete as belonging to him. The coroner testified that the victim's wounds were consistent with having been caused by the weapon recovered by police.

{¶ 14} Appellant was indicted by the Clark County Grand Jury for the aggravated murders of Thelma and David Miller. For each of the two murders, two counts were returned: one charging that the offense was committed with prior calculation and design, and the other charging felony murder premised upon aggravated robbery. Each of the four counts of aggravated murder carried an R.C. 2929.04(A)(5) death penalty specification alleging that the offense was part of a course of conduct involving the purposeful killing of two or more persons. Additionally, appellant was indicted on one count of aggravated robbery.

{¶ 15} Appellant was tried before a three-judge panel. The panel found appellant guilty of the two counts of aggravated (felony) murder and guilty of the death penalty specification in connection with each count. The panel also found appellant guilty of aggravated robbery. The panel found appellant not guilty of the two additional counts of aggravated (premeditated) murder, but guilty on both counts of the lesser included offenses of murder, which were merged with the aggravated murder counts. For each of the two counts of aggravated (felony) murder, the panel sentenced appellant to death. For the remaining offense, appellant was sentenced in accordance with law. On appeal, the court of appeals affirmed appellant's convictions and sentences, including the sentences of death.

{¶ 16} The cause is now before this court upon an appeal as of right.

---

*Stephen A. Schumaker*, Clark County Prosecuting Attorney, *David E. Smith* and *Stephen C. Collins*, Assistant Prosecuting Attorneys, for appellee.

*David H. Bodiker*, Ohio Public Defender, *Kevin L. Fahey* and *Cynthia A. Yost*, Assistant Public Defenders, for appellant.

---

**DOUGLAS, J.**

{¶ 17} Appellant presents twenty-five propositions of law for our consideration. (See Appendix, *infra*.) We have considered appellant's propositions of law and have reviewed the death sentences for appropriateness and proportionality. For the reasons that follow, we affirm the judgment of the court of appeals and uphold the sentences of death.

I

{¶ 18} Previous cases decided by this court are dispositive of the issues raised in appellant's fifth, twentieth, twenty-third, twenty-fourth, and twenty-fifth propositions of law. Without further comment, we reject these propositions of law on authority of *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568.

Likewise, we summarily reject appellant's first, third, eighth, thirteenth, fifteenth and sixteenth propositions of law since the issues raised by appellant have been addressed and discussed in a number of our prior cases. The case law governing these matters is clear, and the events at trial simply do not warrant the relief requested by this appellant. With respect to appellant's remaining propositions of law, we fail to detect any errors that would undermine our confidence in the outcome of appellant's trial. We are convinced that appellant received a fair trial, competent representation, and a fair and reliable sentencing determination. Accordingly, we reject appellant's remaining propositions of law and address, in opinion form, only those issues that merit some discussion.

II

{¶ 19} Prior to trial, appellant moved to suppress the bloodstained jacket and the DNA evidence derived therefrom on the basis that the jacket had been seized without a warrant. The motion was denied. In his second proposition of law, appellant contends that the trial court committed reversible error in denying the motion. We disagree. The facts surrounding the seizure of appellant's jacket are not in dispute. On January 12, 1989, appellant voluntarily submitted to a polygraph test at a crime lab in London, Ohio. The results of the test indicated that appellant was being deceptive. Appellant was arrested at the crime lab on outstanding traffic warrants. Appellant was then transported to the Detective Bureau at the Clark County Sheriff's Department, which is located in the same building as the county jail. Appellant was permitted to use the restroom at the Detective Bureau. Appellant removed his jacket and placed it on a chair before entering the restroom. At that time, Sergeant (now Lieutenant) Patrick Sullivan of the Clark County Sheriff's Department noticed what appeared to be blood on appellant's jacket. Sullivan had interviewed appellant on January 10, 1989, and knew that appellant had been wearing the jacket on the day of the murders. Sullivan seized the jacket while appellant was in the restroom. Appellant was then escorted

to jail where he was booked and processed on the outstanding traffic warrants. Subsequent DNA analysis of the bloodstained jacket revealed that it was highly probable that a bloodstain on the jacket had come from David Miller.

{¶ 20} The trial court denied appellant's motion to suppress the evidence derived from the jacket on the basis that the jacket had been properly seized pursuant to the "plain view" exception to the Fourth Amendment warrant requirement. We find no abuse of discretion in this regard.

{¶ 21} In *State v. Waddy* (1992), 63 Ohio St.3d 424, 442, 588 N.E.2d 819, 833, this court held that:

"Under [the plain view] doctrine, an officer may seize an item without a warrant if the initial intrusion leading to the item's discovery was lawful and it was 'immediately apparent' that the item was incriminating."

{¶ 22} With respect to the first requirement, a lawful initial intrusion, it is clear from the record that appellant was in custody pursuant to a lawful arrest at the time the jacket was seized. The police had every right to be where they were at the time the evidence was seized. Thus, there is no question that the first requirement of the test has been satisfied. Further, the record of the suppression hearing supports the trial court's determination with respect to the second requirement—that the incriminating nature of the stains on appellant's jacket was immediately apparent to the seizing authorities. Sullivan was the chief investigator of the two homicides. Sullivan knew the abusive nature of appellant and Thelma's relationship. Sullivan knew that appellant had repeatedly lied concerning his (appellant's) whereabouts at the time of the murders. Sullivan also knew that appellant was at or near the scene of the murders at the approximate time of the killings. Sullivan had viewed the crime scene and the tremendous amount of blood in the Szulewskis' garage. He had seen appellant wearing the jacket on the day of the murders, and he knew that the stains on the jacket appeared to be blood. Under these circumstances, it is clear that the trial court had a legitimate factual basis to

conclude that Sullivan was immediately aware of the incriminating nature of the bloodstained jacket at the time the item was seized.[1]

{¶ 23} In any event, even if we were to assume that Sullivan had no right to seize the bloodstained jacket at the precise moment that item was taken, it is clear that the jacket would inevitably have come within the exclusive possession and control of the police when appellant was properly booked and processed at the jail. Thus, the inevitable discovery exception to the exclusionary rule seems applicable on the facts of this case. See, generally, *State v. Perkins* (1985), 18 Ohio St.3d 193, 18 OBR 259, 480 N.E.2d 763.

{¶ 24} The court of appeals determined that no warrant was required for the seizure of the jacket since the item was seized as an incident to a lawful arrest. In support of this conclusion, the court of appeals relied on the United States Supreme Court's decision in *United States v. Edwards* (1974), 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771. We need not specifically address this issue since we find that the trial court did not abuse its discretion in holding that the warrantless seizure of appellant's jacket was justified pursuant to the plain view exception to the Fourth Amendment warrant requirement.

{¶ 25} Accordingly, we reject appellant's second proposition of law.

---

1. According to appellant, Sullivan testified at trial that the stains Sullivan had seen on the jacket "could have been any number of things." Appellant also claims that Sullivan testified at trial that it was not readily apparent what was on the jacket at the time the item was seized. We note, however, that the trial court denied the motion to suppress based upon the evidence adduced at the suppression hearing—not based upon the evidence adduced at trial. Thus, the trial testimony has no bearing on the issue whether the trial court abused its discretion in denying the motion to suppress.

III

**{¶ 26}** In his fourth proposition of law, appellant contends that his arrest on the outstanding traffic warrants was pretextual. Appellant suggests that police arrested him on the outstanding warrants in order to gather evidence that appellant was guilty of murder. We reject appellant's arguments for two reasons. First, appellant failed to properly raise this issue at the trial court level. Thus, the issue has been waived. Second, appellant's arguments are not supported by the record. Accordingly, appellant's fourth proposition of law is not persuasive.

IV

**{¶ 27}** In his sixth proposition of law, appellant contends that the three-judge panel erred by admitting into evidence a tape-recorded copy of Daniel Miller's January 8, 1989 emergency telephone call to 911. During the call, Daniel informed the emergency dispatcher that appellant and Thelma were fighting. Daniel told the dispatcher that appellant had hurt Thelma before. On the tape, appellant can be heard shouting at Thelma Miller: "Bitch. You're a fucking whore. Knock the fuck out of your bitch ass. (Inaudible) if I ever see your bitch ass again— I'm going to fuck you up. I'm going to fuck you up Misty, I (Inaudible) fucking sucks."

**{¶ 28}** Appellant contends that the 911 tape was highly inflammatory. According to appellant, admission of the tape introduced into evidence the "entire emotional atmosphere: the sound of violence, of anger in Mr. Kinley's voice, of fear in Daniel's." For this reason, appellant contends that the tape should have been excluded from evidence pursuant to Evid.R. 403 and the Ohio and United States Constitutions. We disagree.

**{¶ 29}** Evid.R. 403(A) provides that evidence is not admissible if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Generally, the admission of evidence is a matter committed to the sound discretion of the trial court. See *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 25,

514 N.E.2d 394, 401 ("A trial court has broad discretion in the admission and exclusion of evidence."). Thus, the three-judge panel's decision to admit the evidence will not be disturbed absent an abuse of discretion.

{¶ 30} The copy of the 911 tape was played in open court during Daniel's trial testimony. Other witnesses established that the copy of the tape was a true and accurate reproduction of Daniel's emergency call to 911. Appellant's statements on the tape demonstrated the intensity of his anger and hostility toward Thelma just two days before the brutal killings. The evidence helped to establish appellant's motive and intent with respect to the killings. Appellant was possessive of Thelma and he did not want her to date other men. Upon a review of the evidence, we find that the trial court did not abuse its discretion in admitting the recorded reproduction of Daniel's emergency call to 911. Additionally, we note that this case was tried before a three-judge panel. Thus, we presume that the panel considered only relevant, material, and competent evidence in arriving at its judgment. See, generally, *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759.

{¶ 31} Appellant also suggests that Daniel's statements on the tape were not admissible at trial pursuant to the hearsay rule. However, at trial, appellant did not specifically object to the tape on the basis of the hearsay rule. Thus, appellant's argument has been waived. Moreover, we agree with the court of appeals' conclusion that "[t]he statements made by Daniel Miller were clearly admissible as 'excited utterances' pursuant to Evid.R. 803(2)."

{¶ 32} Appellant also argues that the 911 tape recording is a record or report that does not qualify under any exception to the hearsay rule. Therefore, appellant urges that the tape itself was not admissible even if statements on the tape fall within a hearsay exception. However, we find that appellant's argument is based upon a misconception of the purpose for which the tape was offered into evidence. The tape was not offered to prove the truth of any statement or assertion contained in the recording. Rather, the tape was offered to show that appellant had threatened

one of the victims a short time before the killings. Therefore, we find that the tape does not meet the definition of "hearsay" set forth in Evid.R. 801(C).[2] The tape was admissible as independent evidence of the threatened acts of violence. Further, appellant has failed to demonstrate prejudice, and none will be presumed.

{¶ 33} Accordingly, we reject appellant's sixth proposition of law.

V

{¶ 34} Having carefully considered each of appellant's propositions of law, we must now review the death sentences for appropriateness (also raised in appellant's twenty-first proposition of law) and proportionality. Appellant hacked his victims to death while committing an aggravated robbery. We find that the R.C. 2929.04(A)(5) aggravating circumstance of which appellant was found guilty in connection with each count of aggravated (felony) murder was proved beyond a reasonable doubt.

{¶ 35} In mitigation, appellant presented evidence concerning his history and family background. In an unsworn statement, appellant apologized to the families involved in this case. He also expressed his love for the victims. We assign these matters very little weight in mitigation.

{¶ 36} Dr. James Eisenberg, appellant's court-appointed psychologist, testified that appellant has "difficulty conforming his conduct in a variety of circumstances." Further, Eisenberg testified that appellant is emotionally immature. According to Eisenberg, appellant's psychological history indicates that appellant suffers from a learning disability. Eisenberg diagnosed appellant as suffering from "a mixed personality disorder with paranoid antisocial and explosive features."

---

2. Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted*." (Emphasis added.)

**{¶ 37}** We assign Eisenberg's testimony some, but very minimal, weight in mitigation. We find that appellant failed to establish the existence of the R.C. 2929.04(B)(3) mitigating factor that he lacked a substantial capacity to conform his conduct to the requirements of the law because of a mental disease or defect.

**{¶ 38}** We have also considered the youth of the offender (appellant was twenty-one years old at the time of the killings) and conclude that this R.C. 2929.04(B)(4) mitigating factor is entitled to some weight in mitigation. In so holding, we are persuaded by the evidence of appellant's emotional immaturity.

**{¶ 39}** Appellant also suggests that this court should consider, as mitigating, any "residual doubt" of appellant's guilt. However, we have no doubt of appellant's guilt. The evidence at trial demonstrated that appellant was extremely possessive of Thelma and did not want her to date other men. Appellant regularly beat Thelma and repeatedly threatened to kill her. Appellant observed Thelma with another man just two days before the murders. At that time, appellant threatened to kill Thelma and Thelma's two children. On January 10, 1989, appellant carried through on his threats by viciously hacking his victims to death. Later, appellant admitted to his friend, Donald A. Merriman, that he had killed the victims. Money and other property were missing from the murder scene. The machete from the Szulewskis' garage was found in an alley near appellant's home. That machete was undoubtedly the weapon that appellant had used to kill his victims. Blood from one of the victims was found on appellant's jacket. Blood was found in the automobile appellant had been driving on the day of the murders. Witnesses saw appellant near the scene of the killings. Appellant eventually admitted that he had been at the location where the murders occurred. This evidence and more contained in the record establish, beyond dispute, that appellant was the perpetrator of the offenses.

**{¶ 40}** For each of the two killings, we have weighed the aggravating circumstance against the evidence presented in mitigation. We find that the

12

aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

{¶ 41} As a final matter, we have undertaken a comparison of the death sentences imposed in this case to those in which we have previously imposed the death penalty. We have upheld the death penalty in a number of cases involving multiple murders. See, *e.g.*, *State v. Montgomery* (1991), 61 Ohio St.3d 410, 575 N.E.2d 167; and *State v. Moreland* (1990), 50 Ohio St.3d 58, 552 N.E.2d 894. Appellant's death sentences are neither excessive nor disproportionate.

{¶ 42} For the foregoing reasons, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

WRIGHT, J., concurs in judgment only.

_____

APPENDIX

{¶ 43} "Proposition of Law I[:]  When DNA testing procedures are unreliable and the probability statistics of a match do not comply with current standards used in the scientific community, the admission of DNA evidence violates the defendant's rights guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution; Article I, Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution and Ohio R. Evid. 401, 402, 403 and 702.

{¶ 44} "Proposition of Law II[:]  When a trial court errors [sic, errs] in denying a motion to suppress evidence[,] said error deprives the defendant of his rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 9, 14, and 16 of the Ohio Constitution.

{¶ 45} "Proposition of Law III[:]  When involuntary statements are not suppressed and are admitted into evidence, said error deprives an appellant of his

rights guaranteed by the Fifth, Eighth and Fourteenth Amendment[s] of the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution.

{¶ 46} "Proposition of Law IV[:]  Evidence obtained through a pretextual arrest must be excluded from trial pursuant to the Fourth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 9, 14, 16, and 20 of the Ohio Constitution.

{¶ 47} "Proposition of Law V[:]  The colloquy conducted by the trial court with appellant Kinley, concerning the waiver of his right to trial by jury, was insufficient to guarantee that appellant Kinley made an intelligent, voluntary, and knowing waiver of that right as guaranteed by the Fifth, Sixth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 5, 9, 16 and 20 of the Ohio Constitution.

{¶ 48} "Proposition of Law VI[:]  The admission into evidence of the 911 tape violated appellant Kinley's rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution; Article I, Sections 1, 9, 10, 16 and 20 of the Ohio Constitution; and Ohio R. Evid. 403, 801, 802, 803 and 805.

{¶ 49} "Proposition of Law VII[:]  The admission of irrelevant, cumulative and prejudicial evidence which confuses and misleads the trier of fact violates that defendant's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution, Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution and Ohio R. Evid. 401, 402 and 403.

{¶ 50} "Proposition of Law VIII[:]  Where evidence of other acts fails to show by substantial proof that because of a unique identifiable plan of criminal activity there is a strong likelihood that the person who committed the other acts also committed the acts charged, the admission of the other acts evidence is in violation of the rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth

Amendment[s] to the United States Constitution and Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution.

{¶ 51} "Proposition of Law IX[:]  Admission of victim impact testimony at a capital trial violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 9, 16 and 20 of the Ohio Constitution.

{¶ 52} "Proposition of Law X[:]  When a trial court abused its discretion by limiting questioning at a suppression hearing, it violated a defendant's right as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment[s] of the United States Constitution, Article I, Section[s] 9, 10, 14, and 16 of the Ohio Constitution and Ohio R. Evid. 101(C)(1) and 104(A).

{¶ 53} "Proposition of Law XI[:]  Testimony containing both irrelevant, unfairly prejudicial matter and matter improperly admitted violates the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 1, 9, 10, 16, and 20 of the Ohio Constitution; and Ohio Rs. [sic] Evid. 401, 402, 403, 612, 801, and 802.

{¶ 54} "Proposition of Law XII[:]  It violates due process for the state to recall witnesses without having given advanced warning it intended to recall them.

{¶ 55} "Proposition of Law XIII[:]  A trial court abuses its discretion when it overrules a defendant's continuance request to investigate the state's untimely disclosed discoverable evidence, in violation of appellant's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Article I, Sections 9, 10 and 16 of the Ohio Constitution and Crim. R. 16.

{¶ 56} "Proposition of Law XIV[:]  An expert witness must testify to a reasonable degree of scientific certainty, which is a probability not a possibility.

{¶ 57} "Proposition of Law XV[:]  A capital defendant is denied his rights to a fair trial, due process and a reliable determination of his guilt and sentence as

guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 10, 16, and 20 of the Ohio Constitution where gruesome and prejudicial photographs are admitted into evidence when their prejudicial effect outweighs their probative value.

{¶ 58} "Proposition of Law XVI[:]   Prosecutorial misconduct denies a capital defendant his due process right to a fair trial as well as his constitutional protections against cruel and unusual punishment.

{¶ 59} "Proposition of Law XVII[:]  The ineffective assistance of counsel provided to appellant Kinley violated his rights to a fair and impartial trial and sentence, as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 5, 9, 10, 16, and 20 of the Ohio Constitution.

{¶ 60} "Proposition of Law XVIII[:]   Due process and equal protection require that the same standards for assessing the impact of wrongly admitted evidence and argument be applied in all capital trials.  A presumption that three judge panels do not consider such evidence and argument denies the defendant these rights.   Rights infringed by this unequal standard and presumption are guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Sections 5, 9, 10 and 16, Article I of the Ohio Constitution.

{¶ 61} "Proposition of Law XIX[:]  A judge should disqualify himself when his impartiality might reasonably be questioned.

{¶ 62} "Proposition of Law XX[:]   The state must introduce sufficient evidence to prove all the elements of aggravated robbery beyond a reasonable doubt.  The failure to do so deprived appellant of his right to due process of law under the Ninth and Fourteenth Amendments to the United States Constitution.

{¶ 63} "Proposition of Law XXI[:]  The death sentence is unreliable and inappropriate in appellant Kinley's case, in violation of the Eighth and Fourteenth

Amendments of the United States Constitution; Article I, Sections 9 and 16 of the Ohio Constitution and Ohio Rev. Code Ann. Section 2929.05.

{¶ 64} "Proposition of Law XXII[:]  In a capital case, a trial court must comply with the dictates of Ohio Rev. Code Ann. Section 2929.03 in filing its opinion imposing the death sentence.

{¶ 65} "Proposition of Law XXIII[:]  The 'proportionality review' required by Ohio Rev. Code Ann. Section 2929.05 must meet the requirements of due process as required by the Fifth, Ninth and Fourteenth Amendments to the United States Constitution.  The present method of proportionality review conducted by this court does not meet those requirements since all capitally charged cases are not included in the comparison.

{¶ 66} "Proposition of Law XXIV[:]   The Fifth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 1, 10, 16, and 20 of the Ohio Constitution; and Ohio Revised Code Ann. Section 2929.05 guarantee a convicted capital defendant a fair and impartial review of his death sentence. The statutorily mandated proportionality process in Ohio is fatally flawed thereby denying appellant Kinley the above rights since trial courts have failed to file written opinions in jury cases where the jury has returned a life verdict.

{¶ 67} "Proposition of Law XXV[:]  The Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution establish the requirements for a valid death penalty scheme.  Ohio's statutory provisions governing the imposition of the death penalty, contained in Ohio Revised Code Sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 do not meet the prescribed requirements and thus are unconstitutional, both on their face and as applied to appellant Kinley."

_____